646 So.2d 279 (1994)
CITY OF TAMPA, Appellant,
v.
THORNTON-TOMASETTI, P.C.; Lev Zetlin Associates, Inc.; and Burton and Rolley, Inc., Appellees.
Nos. 93-02551, 93-02666.
District Court of Appeal of Florida, Second District.
December 2, 1994.
*280 Michael A. Fogarty and Richard E. Fee of Glenn Rasmussen & Fogarty, Tampa, for appellant.
Edward O. Savitz of Bush Ross Gardner Warren & Rudy, P.A., Tampa, for appellees Thornton-Tomasetti, P.C. and Lev Zetlin Associates, Inc.
Michael R. Carey and Daniel D. Whitaker of Carey and O'Malley, Whitaker & Lins, P.A., Tampa, for appellee Burton and Rolley, Inc.
FRANK, Chief Judge.
The question we have considered and determined is whether Thornton-Tomasetti, P.C., and Burton and Rolley, Inc., two professional engineering firms not in privity with the City of Tampa, are liable for the City's economic losses flowing from the construction of the Tampa Bay Performing Arts Center (Center).
In a cooperative effort, the City and the Center solicited bids for the preparation of construction plans and specifications. Ultimately, a joint venture of architects  Arcop, Inc., and Design Arts Group, Inc.  was awarded the architectural contract.[1] The architects, in turn, contracted with Thornton-Tomasetti, Lev Zetlin Associates, Inc., and Burton & Rolley (the consultants) to assist in the design of the Center.[2]
The City's competitive bid process culminated in the award of the general contract to Great Southwest Corporation. During the bidding and into construction, problems arose from errors and discrepancies in the plans and specifications. Flaws in the design forced Great Southwest and its subcontractors to stop work periodically and await clarification from the architects. The construction delays caused Great Southwest, on behalf of itself and its subcontractors, to file an *281 action against the City seeking more than $20,000,000 in damages. The City ultimately settled the claim for $9,500,000. Of that amount, insurance covered all but $3,232,500, which the City paid.
Thereafter, in August of 1991, the City filed this lawsuit against the architects and other design team members. Specifically, the City alleged that the design team's negligent preparation of the plans and specifications, coupled with its negligent failure to review, revise and coordinate shop drawings, caused numerous costly delays. In addition to the tort claims, the City also asserted several breaches of the design contract. Thornton-Tomasetti and Burton & Rolley separately sought to dismiss the City's complaint on the grounds that the tort claims were precluded by the "economic loss" rule and that the City was not an intended third party beneficiary of the architects' subcontracts with them.[3] The trial court dismissed the consultants from the breach of contract claims; the tort claims, however, survived. The City filed an amended complaint and Thornton-Tomasetti again launched an attack upon it raising the economic loss rule as a bar to recovery. This time the trial court agreed and dismissed Thornton-Tomasetti with prejudice. In so doing, the court acknowledged its failure in earlier rulings to dismiss: "To the extent this ruling is or seems to be inconsistent with prior rulings ..., this Court can only echo Judge Altenbernd when he stated in Sandarac [Association, Inc. v. W.R. Frizzell Architects, Inc., 609 So.2d 1349, 1352 (Fla. 2d DCA 1992)] that `the economic loss rule is stated with ease but applied with great difficulty.'" The City stipulated that the court's ruling also precluded its claim against Burton & Rolley; hence a stipulated final summary judgment in favor of Burton & Rolley was entered. It is from the orders of dismissal and the final summary judgment that the City has appealed.
Because the City seeks to recover purely economic losses, it can arguably state no grounds for relief in tort. See AFM Corp. v. Southern Bell Tel. & Tel. Co., 515 So.2d 180 (Fla. 1987); Florida Power & Light Co. v. Westinghouse Electric Corp., 510 So.2d 899, 902 (Fla. 1987) (principles of contract, not tort, govern claims for economic loss where there is no accompanying personal injury or damage to the property outside of the contract); Sandarac Ass'n, Inc. v. W.R. Frizzell Architects, Inc., 609 So.2d 1349, 1355 (Fla. 2d DCA 1992) ("Because the law of negligence does not recognize a protected interest in purely economic loss, no cause of action exists under such circumstances"), rev. denied, 626 So.2d 207 (Fla. 1993). The City, urging the rationale of section 552, Restatement (Second) of Torts, has contended, however, that its tort claims are excepted from the economic loss doctrine.[4] We disagree based upon the following analysis.
It is true that in limited circumstances, professionals can be held liable to noncontractual parties for economic damages arising from professional negligence. See First Florida Bank, N.A. v. Max Mitchell & Co., 558 So.2d 9 (Fla. 1990); First American *282 Title Ins. Co., Inc. v. First Title Service Co. of the Florida Keys, Inc., 457 So.2d 467 (Fla. 1984); Lorraine v. Grover, Ciment, Weinstein & Stauber, P.A., 467 So.2d 315 (Fla. 3d DCA 1985). As these cases make clear, liability is extended not to all who may be within the class of the foreseeably injured but only to distinct third parties whose reliance upon documents or information furnished by the professional constituted the "end and aim of the [underlying] transaction." See, e.g., First American, 457 So.2d at 472 (property purchaser's reliance upon defective title negligently prepared by abstracter); Max Mitchell, 558 So.2d at 11 (lender's reliance upon financial statement negligently prepared by borrower's accountant); Lorraine, 467 So.2d at 319 (beneficiary's loss caused by attorney's negligent drafting of will for client).
The expansion of negligence law to protect economic interests not traditionally protected in tort has been applied to the construction industry, but in a restricted fashion. The leading decision is A.R. Moyer, Inc. v. Graham, 285 So.2d 397 (Fla. 1973), in which our supreme court, employing principles of products liability law, held that a general contractor relying on design specifications could sue the architect or engineer who crafted the plans, despite the absence of privity. The owner in Moyer contracted with the architects to prepare plans for construction of an apartment building and to supervise the general contractor in building the project in conformity with the architects' plans. Within this specific setting, Moyer recognized that a supervising architect has the "power of economic life or death" over the general contractor and that such a great degree of control should also carry with it a duty of due care to the general contractor despite the absence of a contractual relationship. 285 So.2d at 401. The court justified the enlargement of liability to third parties based upon the view that the legal responsibility of the architect should be commensurate with the architect's control of the construction project. Id. Moyer has been limited to its facts. See Casa Clara Condominium Ass'n, Inc. v. Charley Toppino & Sons, Inc., 620 So.2d 1244 (Fla. 1993). More recently, the fifth district interpreted A.R. Moyer to permit tort liability in the circumstance of an engineer "who negligently performs a professional engineering service, knowing that another person will be injured if it is negligently performed ..., even though there is no contract between the parties." Southland Const., Inc. v. Richeson Corp., 642 So.2d 5 (Fla. 5th DCA 1994). The Southland general contractor sued an engineer and engineering firm hired to design a retaining wall. The Southland court thought it "abundantly" foreseeable that the general contractor, as user of the plans, would suffer damages if the design were below professionally acceptable standards. Southland, 642 So.2d at 8. Concluding, therefore, that the "circle of foreseeability" between the parties was "closer and tighter" than in Moyer, the court reversed the summary judgment for the engineer. 642 So.2d at 9.
The facts of the present case differ substantially from Moyer and Southland. In the latter cases, an extremely close nexus existed between the plaintiff and the defendant. Here, a "close nexus" did not exist between the City and the engineering consultants. Pursuant to the typical construction relationship, the consultants looked to the architects, not the City, for payment of compensation and expenses. The architects, not the consultants, agreed to draw the final plans and specifications and to advise the City in their interpretation. The architects, not the consultants, were responsible for coordinating the work of design team members; thus, only the architects were answerable to the City for deficiencies in design or performance.
Turning now to the City's claim based upon contractual notions, our courts have been reluctant to expand the privity exception to an incidental third party beneficiary, such as the City. Unless a contract is entered into for the direct and substantial benefit of a third party, it binds and benefits only the parties themselves. Thompson v. Commercial Union Ins. Co. of New York, 250 So.2d 259 (Fla. 1971); Horizon Images, Inc. v. Delta Color Graphics, Inc., 639 So.2d 186 (Fla. 4th DCA 1994). The intention of the contracting parties, gleaned from the contract itself, is determinative. Technicable Video Systems, Inc. v. Americable of Greater *283 Miami, Ltd., 479 So.2d 810 (Fla. 3d DCA 1985). It is not enough that the professional services ultimately rendered accrue to the owner. Publix Super Markets, Inc. v. Cheesbro Roofing, Inc., 502 So.2d 484, 488 (Fla. 5th DCA 1987). In our view, the subcontracts between the architects and the consultants did not immediately benefit the City. At best, the City was a remote or incidental beneficiary of the consultants' obligations to the architects. Although the City points to provisions in the subcontracts providing, for example, that all design documents the consultants prepared for the architects were to be approved by the City, it is evident from the agreements that the consultants' contractual responsibilities were confined to the architects and did not extend to the City.
The City has asserted that if the trial court's orders are sustained it will have no remedy for the negligence of the design team.[5] To expose a consultant not in privity with the owner to the same liability as the professional in privity would diminish the willingness of persons or entities not a part of the central bargain to provide services at the risk of having vicariously to participate in unanticipated losses. This dispute, in truth, is over the performance of the architects, not the consultants. Despite the City's unfortunate position, contractual liability "can not be extended or enlarged on the ground, alone, that the situation and circumstances of the parties justify or demand further or other liability." People ex rel. Resnik v. Curtis & Davis, Architects and Planners, Inc., 78 Ill.2d 381, 36 Ill.Dec. 338, 339, 400 N.E.2d 918, 919 (1980).
Accordingly, we affirm.
PATTERSON and QUINCE, JJ., concur.
NOTES
[1] Tampa Bay Performing Arts Center, Inc., was the actual signatory to the owner/architect contract. Subsequent to the execution of the contract on November 18, 1981, however, the Center assigned all of its rights and obligations under the agreement to the City.
[2] Lev Zetlin Associates is alleged to be the alter ego of Thornton-Tomasetti and makes no appearance in this appeal.
[3] The economic loss rule prohibits tort recovery for economic damages where there is no personal injury or damage to other property. Economic damages are those associated with inadequate value, costs of repair, or consequent loss of profits; in other words "disappointed economic expectations" that are protected in contract law, rather than in tort law. See Casa Clara Condominium Ass'n., Inc. v. Charley Toppino & Sons, Inc., 620 So.2d 1244, 1246 (Fla. 1993).
[4] The relevant provisions of Restatement (Second) of Torts § 552 (1976), read as follows:

Information Negligently Supplied for the Guidance of Others
(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
[5] In 1988, the architectural firm, Design Arts Group, Inc., filed for Chapter 11 reorganization in bankruptcy. Prior to it's filing the instant lawsuit, the City submitted a claim in that bankruptcy proceeding. On August 30, 1990, the City, Design Arts Group, Arcop, Inc., and the insurer entered into a formal settlement agreement of all claims, which the bankruptcy court subsequently approved. Continental Casualty Company paid the sum of $1,000,000 to the City out of the $10,000,000 professional design policy. On April 15, 1991, when the City settled the suit with the general contractor, Continental Casualty contributed the sum of $6,250,000 toward the $9,500,000 settlement amount. The balance of the insurance proceeds was consumed by attorney's and expert witness fees.