60 F.3d 734
 PULTE HOME CORP., Plaintiff-Appellant,
v.
OSMOSE WOOD PRESERVING, INC., Defendant-Cross-Defendant-Appellee,
Georgia Pacific Corp.; Lowe's Companies; Lowe's Investment
Co., Defendants-Cross-Claimants-Third Party Plaintiffs.
 No. 93-2314.
 United States Court of Appeals,
Eleventh Circuit.
 July 18, 1995.
Rehearing Denied Aug. 30, 1995.
 
 Robert W. Boos, Kevin M. Gilhool, Tampa, FL, Stephen Wasinger, E. Powell Miller, E. Norma McKenna, Detroit, MI, for appellant.
 Michael K. Houtz, Harris, Barrett, Mann & Dew, Tampa, FL, Read K. McCaffrey, Andrew J. Tolant, Patton, Boggs & Blow, Baltimore, MD, and T. Gregory Slother, Griffin, GA, for appellee.
 Barbara Wrubel, Loring I. Fenton, Skadden, Arps, Slate, Meagher & Flom, New York City, and Debra M. Kubicsek, Langford, Hill, Mitchell, Trybus & Whalen, P.A., Tampa, FL, for Georgia Pacific Corp.
 David Paul Rhodes, Raymond A. Haas, and David LoNigro, Haas, Austin, Ley, Roe & Patsko, P.A., Tampa, FL, for Lowe's Inv. Co.
 Appeal from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, Chief Judge, DYER and RONEY, Senior Circuit Judges.
 TJOFLAT, Chief Judge:
 
 
 1
 Appellant Pulte Home Corporation ("Pulte"), a nationwide homebuilder, challenges the grant of judgment notwithstanding the verdict in favor of appellee Osmose Wood Preserving, Inc. ("Osmose"), a manufacturer of chemicals that were applied to plywood Pulte used in constructing the roofs of 1876 townhouses. After the townhouses were sold, the chemicals caused the plywood to deteriorate; Pulte subsequently replaced the plywood at a cost exceeding $3,650,000. A jury found that Pulte's loss from replacing the plywood was caused by Osmose's (1) misrepresentation that the plywood would not deteriorate and (2) negligence in failing to warn Pulte that the plywood would deteriorate, and it awarded Pulte $3,750,000 in compensatory damages. Finding that Osmose's misrepresentation was made with fraudulent intent to induce Pulte to purchase Osmose-treated plywood, the jury awarded an additional $2,500,000 in punitive damages.
 
 
 2
 Following the return of the jury's verdict, but before entering judgment, the district court revisited Osmose's Fed.R.Civ.P. 50(a) motion, which had been made prior to the submission of the case to the jury, and granted Osmose judgment as a matter of law. The court acted on the theory that Pulte's tort claims were barred by the economic loss rule. We agree with the district court that the economic loss rule barred Pulte's negligence claim, but disagree that the rule precluded its fraud claim. The evidence adduced at trial, however, did not support that claim. We therefore affirm the district court's judgment in full.
 
 I.
 
 3
 Pulte, one of the largest homebuilders in the United States, operates building divisions in several states including Florida and Georgia.[1] Pulte constructs and sells between seven and ten thousand homes each year. These homes include condominiums, single family homes, and multi-family townhouses, which are sold at various prices. The multi-family townhouses consist of a row of single-family housing units that are joined by a common wall and, in part, at the roof.
 
 
 4
 During the time period relevant to this case, Osmose manufactured a chemical used by lumber suppliers to make plywood fire retardant and specified the procedures that the suppliers had to follow in treating the plywood.[2] After treatment, the suppliers stamped each sheet of plywood with the Osmose trademark to certify that the wood had been treated with Osmose fire retardant chemicals. Although Osmose itself did not treat or sell the plywood that carried its trademark, Osmose distributed promotional materials that described the safety and effectiveness of plywood treated with its chemicals. At the time of the incidents giving rise to this cause of action, Osmose was only one of several manufacturers of chemicals used to create fire retardant treated ("FRT") plywood. Moreover, Osmose's competitors conducted business essentially in the same manner as did Osmose, and their trademarks were also placed on plywood treated with their products.
 
 
 5
 FRT plywood was primarily used as a fire wall and in the common roof areas of multi-family townhouses. Every major building code required the use of noncombustible materials, including, for example, FRT plywood, in the common roof areas of multi-family townhouses.[3] The specific purpose of these code provisions was to ensure that builders designed and constructed multi-family housing in a manner that would prevent the spread of fire between the individual housing units.[4] When a builder used FRT plywood to satisfy code fire safety requirements, building inspectors would not issue an occupancy permit for a multi-family townhouse unless the plywood in the common roof areas carried a FRT certification stamp.[5]
 
 
 6
 In addition to a FRT certification stamp, every sheet of FRT plywood carried a second certification stamp mandated by the American Plywood Association ("APA").[6] The APA stamp, which denoted the strength characteristics and appropriate uses for the plywood,[7] was placed on the wood directly by the plywood manufacturer. The APA stamp was placed on plywood prior to any treatment process, including the fire retardant treatment.
 
 
 7
 The APA stamp also was required by the major building codes, such that an inspector would not issue an occupancy permit unless the APA stamp indicated that the wood was being used for its specified purpose. The APA stamp could not be relied on, however, for wood that subsequently underwent a fire retardant treatment procedure because the treatment process and chemicals used therein resulted in a strength loss. The building codes reflected this fact by requiring builders to "take into account" at least a one-sixth reduction in strength when using FRT plywood.
 
 
 8
 Beginning in 1984, Pulte constructed 1876 townhouses with roofs containing FRT plywood treated with Osmose chemicals.[8] When purchasing FRT plywood, Pulte purchasing agents did not specify a particular brand name, such as Osmose, nor did they rely on any of Osmose's promotional materials. Rather, Pulte treated FRT plywood as a "commodity," requiring only that it be cost-effective and contain the code-mandated FRT stamp.
 
 
 9
 In late 1988, after Pulte had sold the townhouses containing Osmose-treated FRT plywood, Pulte began receiving scattered reports that the plywood in its multi-family townhouses was degrading in service.[9] At the same time, Pulte also became aware of reports in wood industry journals indicating that FRT plywood generally was unfit for use in roof systems because high temperatures and humidity levels in attic environments caused excessive reductions in the strength and structural integrity of the plywood.[10]
 
 
 10
 In response to these reports, Pulte immediately notified its homeowners of the situation and warned them to stay off their roofs until Pulte could inspect them. After inspection, Pulte discovered universal degradation in the Osmose-treated FRT plywood, such that, according to Pulte, every roof containing Osmose-treated FRT plywood was "dangerously unpredictable" and unsafe.[11] Appellant's Brief at 6.
 
 
 11
 Pulte asked Osmose for assistance in resolving its FRT plywood dilemma, but Osmose refused. Pulte then launched an extensive remedial campaign culminating in the systematic replacement of all of the Osmose-treated FRT plywood. In replacing this plywood, Pulte was also forced to remove and replace other components of its roof systems, including untreated plywood and shingles. In total, Pulte's roof replacement project cost $3,658,200, or $1950 per roof.
 
 II.
 
 12
 On June 2, 1989, Pulte brought this diversity action against Osmose in the United States District Court for the Middle District of Florida. In its five-count complaint, which also named Lowe's Companies and Georgia Pacific Corporation as party defendants, Pulte alleged that Osmose "is engaged in the manufacture and sale of ... fire retardant plywood" and that Lowe's and Georgia Pacific had sold Pulte substantial quantities of "FRT plywood manufactured by Osmose."[12] Pulte subsequently reached undisclosed settlement agreements with Lowe's and Georgia Pacific and dismissed its claims against those defendants.
 
 
 13
 The five counts against Osmose in Pulte's complaint alleged: (1) breach of express and implied warranties; (2) strict liability; (3) negligence; (4) "common law misrepresentation;" and (5) fraud. In each count, Pulte sought compensatory and punitive damages. After the parties joined issue, Pulte voluntary dismissed its breach of warranty claims. On February 20, 1992, the case proceeded to trial on the claims that remained. At the close of all of the evidence, Osmose moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). The court denied its motion and submitted the case to the jury on Pulte's claims for strict liability, fraud, and negligence.[13] By special verdict, the jury found in favor of Osmose on Pulte's claim of strict liability, concluding that the chemicals were not defective when they left Osmose's control. The jury also concluded that Osmose had been negligent in failing to warn Pulte that the FRT plywood would deteriorate if incorporated into Pulte's construction of the townhouse roofs (the negligence claim) and that Osmose had fraudulently induced Pulte to purchase the plywood (the fraud claim). Accordingly, the jury awarded Pulte $3,750,000 in compensatory damages (on both claims) and an additional $2,500,000 in punitive damages (on the fraud claim).
 
 
 14
 After the jury rendered its verdict, the district court revisited Osmose's Rule 50(a) motion, and, concluding that the economic loss rule barred Pulte's negligence and fraud claims, entered judgment for Osmose. Pulte now appeals.
 
 III.
 
 15
 We review the district court's grant of Rule 50(a) relief by considering the evidence in the light most favorable to the nonmoving party. In so doing, we recognize that "[j]udgment as a matter of law after the verdict may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A James W. Moore et al., Moore's Federal Practice p 50.07 (2d ed. 1995). As such, "we must independently determine whether the facts and inferences point so overwhelmingly in favor of the movant ... that reasonable people could not arrive at a contrary verdict." Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1448 (11th Cir.1991). Finally, the entry of judgment as a matter of law is appropriate if "the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." Smith v. United States, 894 F.2d 1549, 1552 (11th Cir.1990).
 
 
 16
 We conclude that Pulte is not entitled to recover on either its negligence or fraud claims.[14] We find that Pulte's negligence claim is barred by the economic loss rule and does not meet either exception to the rule. Although we disagree with the district court that the economic loss rule, as applied in Florida,[15] bars Pulte's claim for fraud in the inducement, we nonetheless hold that Pulte is not entitled to relief on that claim. In short, Pulte failed to establish essential elements of its claim that Osmose fraudulently induced its purchase of Osmose-treated FRT plywood. Specifically, other than the representations contained in Osmose promotional literature, Pulte presented no evidence from which the jury could conclude that Osmose made any misrepresentations or guarantees to Pulte regarding the strength of the FRT plywood treated with Osmose chemicals. Moreover, to the extent that Osmose's promotional literature misrepresented the properties of plywood treated with its chemicals, Pulte failed to establish that it actually relied on those statements in purchasing the Osmose-treated FRT plywood.
 
 A.
 
 17
 The economic loss rule "prohibits tort recovery when a product damages itself, causing economic loss, but does not cause personal injury or damage to any property other than itself." Casa Clara Condominium Ass'n v. Charley Toppino & Sons, Inc., 620 So.2d 1244, 1246 (Fla.1993). Economic loss includes " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to other property.' " Id. (emphasis added) (quoting Note, Economic Loss in Products Liability Jurisprudence, 66 Colum.L.Rev. 917, 918 (1966)). The rationale underlying the economic loss rule is that parties should protect against the risk of economic loss during contract negotiations through warranty provisions and price adjustments rather than attempt to recover under tort law after the loss occurs. Florida Power & Light Co. v. Westinghouse Elec. Corp., 510 So.2d 899, 901 (Fla.1987); see also Casa Clara, 620 So.2d at 1246 ("The rule is 'the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others.' " (quoting Sidney R. Barrett, Jr., Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis, 40 S.C.L.Rev. 891, 894 (1989))); Strickland-Collins Constr. v. Barnett Bank, 545 So.2d 476, 477 (Fla. 2d Dist.Ct.App.1989) ("Florida will not create a duty in tort to permit recovery of economic losses where the litigants have allocated the various risks of their bargain by contract.").
 
 
 18
 Although the Florida Supreme Court did not formally approve the economic loss rule until the Florida Power & Light decision in 1987, the court acknowledged that the doctrine, which has been adopted by the majority of jurisdictions, was "not a new principle of law in Florida." 510 So.2d at 902. In Florida Power & Light, the court held that the economic loss rule barred a public utility from recovering under a negligence theory for the cost of repair, revision, and inspection of several malfunctioning steam generators manufactured and sold by Westinghouse. Id. Since that time, Florida courts have applied the economic loss rule in a variety of contexts. See, e.g., AFM Corp. v. Southern Bell Tel. & Tel. Co., 515 So.2d 180 (Fla.1987) (extending the economic loss rule to contracts for services); Aetna Life & Casualty Co. v. Therm-O-Disc, Inc., 511 So.2d 992 (Fla.1987) (holding that Florida's long-arm statute did not provide jurisdiction when the injury caused by the foreign corporation was purely economic loss); Sandarac Ass'n v. W.R. Frizzell Architects, Inc., 609 So.2d 1349 (Fla. 2d Dist.Ct.App.1992) (holding that a condominium association could not sue the general contractor or architects in negligence for defects in the condominium's common areas), review denied, 626 So.2d 207 (Fla.1993); Strickland-Collins Constr., 545 So.2d at 477 (holding that the doctrine bars a general contractor's negligence claim against a bank for misapplication of funds from a construction loan).
 
 
 19
 Following the supreme court's decision in A.R. Moyer, Inc. v. Graham, 285 So.2d 397 (Fla.1973) (permitting a general contractor to bring a negligence action for economic loss against a supervising architect despite a lack of privity), Florida courts have allowed negligence actions for purely economic loss in certain cases. Most recently, however, the Florida Supreme Court has rigidly applied the economic loss rule by limiting Moyer to its facts and disapproving other cases allowing similar claims, Casa Clara, 620 So.2d at 1248 & n. 9, as well as refusing to create additional exceptions to the rule, id. at 1247-48 (declining to exempt the purchase of houses from the economic loss rule).[16] Accordingly, the lower courts have been equally rigorous in applying the doctrine. See City of Tampa v. Thornton-Tomasetti, P.C., 646 So.2d 279 (Fla. 2d Dist.Ct.App.1994) (refusing to follow Moyer and rejecting a negligence claim against the architects of a city project); Spancrete, Inc. v. Ronald E. Frazier & Assocs., 630 So.2d 1197 (Fla. 3d Dist.Ct.App.1994) (affirming the dismissal of a subcontractor's negligence claim against a supervising architect because Moyer had been limited to its facts). But see Southland Constr., Inc. v. Richeson Corp., 642 So.2d 5 (Fla. 5th Dist.Ct.App.1994) (allowing a negligence claim against an engineer, individually, for professional malpractice despite the limitations on Moyer ).
 
 B.
 
 20
 We first examine Pulte's negligence claim. Pulte alleges that Osmose negligently breached its duty to Pulte by failing to warn Pulte that FRT plywood treated with Osmose chemicals could not be used in attic environments. Stated another way, had Osmose warned Pulte (and other similarly situated purchasers) that FRT plywood treated with its chemicals " '[wa]s inferior in quality and [would] not work for the general purposes for which it was manufactured and sold,' " Pulte would not have bought the product. Casa Clara, 620 So.2d at 1246 (quoting Comment, Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages--Tort or Contract?, 114 U.Pa.L.Rev. 539, 541 (1966)). Pulte's negligence claim presents precisely the type of "disappointed economic expectation" claim that Florida's strict interpretation of the economic loss rule forecloses.
 
 
 21
 Consequently, we must determine whether Pulte's claim falls within one of the two exceptions to the economic loss rule, which permit a tort claim if personal injury or damage to other property accompany economic loss. See, e.g., Casa Clara, 620 So.2d at 1247; Florida Power & Light, 510 So.2d at 901. The first exception is readily dismissed: Because no individual has been physically injured as a result of the weakened plywood, Pulte's negligence claim does not fall within the personal injury exception to the economic loss rule.
 
 
 22
 To satisfy the other property exception, Pulte must establish damage to property aside from the FRT plywood treated with Osmose chemicals. See Therm-O-Disc, 511 So.2d at 994 (requiring "property damage to property other than the allegedly defective goods"). Pulte incorporated the FRT plywood into its townhouses, such that the deterioration of the plywood destroyed the structural integrity of the roof. As a result, Pulte was forced to remove and replace the FRT plywood. In doing so, Pulte also had to remove and replace other portions of the roof, including untreated plywood and shingles. These other roof components form the basis of Pulte's "other property" argument.
 
 
 23
 In Casa Clara, 620 So.2d 1244, the Florida Supreme Court held that the economic loss rule barred homeowners' negligence claims against a subcontractor who supplied faulty concrete that was used in their homes. The court rejected the homeowners' assertion that other property damage had occurred when steel reinforcements rusted due to the unusually high salt content of the concrete. Id. at 1245, 1247. In discussing the damage to other property exception, the court explained: "The character of a loss determines the appropriate remedies, and, to determine the character of a loss, one must look to the product purchased by the plaintiff, not the product sold by the defendant." Id. at 1247 (citing King v. Hilton-Davis, 855 F.2d 1047 (3d Cir.1988) (applying Pennsylvania law), cert. denied, 488 U.S. 1030, 109 S.Ct. 839, 102 L.Ed.2d 971 (1989)). Because the concrete was "an integral part of the finished product"--the house the buyers had bargained for--the other property exception did not apply. Id.
 
 
 24
 In E.I. DuPont de Nemours & Co. v. Finks Farms, Inc., 656 So.2d 171 (Fla. 2d Dist.Ct.App.1995), on the other hand, the court found that the damage to other property exception did apply. In that case, after a farmer sprayed Benlate, a fungicide manufactured by DuPont, on his tomato plants to prevent disease, the crop failed to grow at a normal pace or to normal size. Id. at 172. The court determined that Benlate, the finished product bargained for and purchased by the farmer, had caused damage to other property, the tomato plants or land in which they grew. Id.
 
 
 25
 In the present case, Pulte cannot establish that there was damage to other property. Under the Casa Clara definition, the product bargained for and purchased by Pulte was the Osmose-treated FRT plywood. Based on the evidence offered at trial, the FRT plywood itself was the only property damaged.[17] Although Pulte did replace roof components other than the FRT plywood, these components were not replaced because they were damaged. Rather, replacing the shingles and other materials was merely a consequence of replacing the damaged FRT plywood. Casa Clara specifically stated that economic loss includes the costs of replacing the defective product. 620 So.2d at 1246. These costs simply do not trigger the other property exception. As such, the other property damage Pulte complains of is nothing more than pure economic loss for which Pulte cannot recover in tort.
 
 
 26
 Pulte failed to guard against the possibility that the Osmose-treated FRT plywood would not meet its economic expectations. Instead, Pulte chose to assume that the product would meet its specific needs. Pulte did not inquire as to the capabilities of plywood treated with Osmose fire retardant chemicals nor did Pulte demand assurances and warranties from Osmose that the products would meet its expectations. As a result, Pulte suffered a bitter and costly economic loss. Having failed to avail itself of the opportunity to mitigate the risks of potential disappointment at the time of contract negotiation, Pulte cannot now resort to the courts to save it from a bargain improvidently made.
 
 C.
 
 27
 We now turn to Pulte's fraud claim. Although the economic loss rule bars recovery for tort claims arising from breach of a contract, the doctrine does not preclude a claim for damages occasioned by an independent tort, including fraud in the inducement of a contract. See AFM Corp., 515 So.2d at 181-82; Burton v. Linotype Co., 556 So.2d 1126, 1128 (Fla. 3d Dist.Ct.App.1989) ("Fraud in the inducement and deceit are independent torts for which compensatory and punitive damages may be recovered."), review denied, 564 So.2d 1086 (Fla.1990).
 
 
 28
 Nevertheless, at trial, Pulte failed to prove its claim of fraud in the inducement. To prevail on such a claim, Pulte had to establish the following elements:
 
 
 29
 (1). A misrepresentation of a material fact;
 
 
 30
 (2). The representor of the misrepresentation, knew or should have known of the statement's falsity;
 
 
 31
 (3). Intent by the representor that the representation will induce another to rely and act on it; and
 
 
 32
 (4). Resulting injury to the party acting in justifiable reliance on the representation.
 
 
 33
 Lou Bachrodt Chevrolet, Inc. v. Savage, 570 So.2d 306, 308 (Fla. 4th Dist.Ct.App.1990) (per curiam), review denied, 581 So.2d 165 (Fla.1991); see also Miller v. Sullivan, 475 So.2d 1010, 1011-12 (Fla. 1st Dist.Ct.App.1985).
 
 
 34
 Pulte contends that Osmose fraudulently induced it to purchase FRT plywood treated with Osmose chemicals in two respects. First, Pulte alleges that "[e]very single piece of Osmose FRT plywood contained [APA and FRT] certifications that the FRT plywood complied with applicable building codes and standards;" that those certifications were false; that it relied on those certifications; and that it would not have purchased the FRT plywood but for those certifications. Appellant's Brief at 35. Second, Pulte asserts that Osmose's promotional literature misrepresented that Osmose-treated FRT plywood conformed to the building codes. We disagree because the record contains no such showings.
 
 
 35
 The APA stamp, which was affixed by the plywood manufacturer, indicated the strength characteristics and appropriate uses of the plywood; the stamp communicated nothing regarding whether the plywood complied with "applicable building codes and standards." The FRT stamp merely indicated that the plywood had been treated with fire retardant chemicals. In short, the certifications of neither stamp were false, and Pulte's statement that it would not have purchased the plywood without these certifications is simply of no moment.
 
 
 36
 Pulte also cites to internal memoranda and communications with licensees in which Osmose represented that it would "stand behind" its products and that Osmose's "treating technology and quality control procedures were developed to ensure that [its chemicals] ... meet[ ] required specifications and provide[ ] ... full value, safety and durability." Defendant's Exhibit No. 263, at 3; Defendant's Exhibit No. 316, at 1. Even if we were to assume that those statements were false, Pulte still could not recover on its fraud claim because Pulte did not rely on those statements in deciding which FRT plywood to purchase. At trial, Osmose presented a host of Pulte employees who testified that they had never seen any Osmose literature and that they had never asked for Osmose-treated FRT plywood by name. According to that testimony, Pulte never "read any product literature on Osmose FRT products," Record, vol. 36, at 120; "spoke[ ] with anyone at Osmose," id. at 123; "specif[ied] the brand of FRT [plywood] to be used," id. at 124.[18] In short, Pulte regarded FRT plywood as a fungible commodity; all that mattered to Pulte was that the plywood bore an FRT stamp and that the plywood could be purchased at the right price.[19] Thus, Pulte failed to establish at least two key elements of its fraud in the inducement claim; Pulte did not show any misrepresentation by Osmose or any reliance by Pulte on such representations.
 
 IV.
 
 37
 In conclusion, the economic loss rule bars Pulte's recovery in negligence for the purely economic losses relating to Pulte's disappointed commercial expectations. Furthermore, Pulte's negligence claim does not fit within either exception to the economic loss rule. Finally, Pulte did not meet its burden of proof with respect to its claim of fraud in the inducement. Accordingly, the grant of judgment in favor of Osmose is AFFIRMED.
 
 
 38
 IT IS SO ORDERED.
 
 
 
 [1]
 In reviewing the district court's grant of judgment as a matter of law, we consider the evidence and state the facts in the light most favorable to Pulte, the nonmoving party
 
 
 [2]
 The relationships between Osmose and the plywood manufacturers were defined by licensing agreements that provided, among other things, that the suppliers were obligated to operate "in accordance with the latest Osmose specifications and procedures" and that "[c]ompliance with this stipulation is of the essence of this agreement, and failure to comply gives Osmose the right to cancel [the licensing] agreement." Defendant's Exhibit No. 138, at 2
 
 
 [3]
 All of the major building codes, including those promulgated by the federal government, that were in effect in the locations in which Pulte constructed multi-family townhouses permitted the use of FRT plywood as a fire retardant in roof sheathing
 
 
 [4]
 In addition, the building codes set forth a protocol defining the reference standards that had to be met, as well as a battery of tests that had to be passed, before a company would be permitted to certify that its FRT plywood met code specifications. The test protocol included flame spread and smoke spread evaluations
 
 
 [5]
 Due to the importance of the FRT stamp to building inspectors, Pulte generally installed its FRT plywood with the certification facing down to make it visible to the inspector
 
 
 [6]
 Every sheet of plywood, whether treated with fire retardant chemicals or not, received an APA stamp
 
 
 [7]
 The APA stamp consisted of two numbers separated by a dash (e.g., 24-0). The first number indicated the maximum allowable distance between supports for the sheets of plywood as installed. For instance, the "24" in the example above indicated that the plywood could be installed at a maximum span of twenty-four inches between each truss. The second number, the "0," informed builders that the plywood was suitable for use as roof sheathing. Thus, this qualification denoted the heightened grade and strength levels necessary to meet the higher load bearing requirements for roofs as opposed to walls
 
 
 [8]
 The Pulte townhouses containing Osmose-treated FRT plywood were built in Florida, Georgia, Illinois, Maryland, and Virginia
 
 
 [9]
 "Degrading in service" means that, in addition to the strength loss caused by the treatment process itself, the wood suffered further strength reductions due to the high temperatures and humidity levels in the attic environments in which the wood was placed
 
 
 [10]
 A normal attic environment in the United States may experience temperatures as high as 170 to 180 degrees. This extreme heat often is accompanied by excessive moisture and humidity. Of course, these temperature and humidity levels vary with the geographic location of the home
 
 
 [11]
 Tests Osmose conducted confirmed Pulte's findings. The tests, conducted in simulated attic environments, revealed that after 28 days of accelerated aging at 160 degrees, the Osmose-treated FRT plywood lost 72% of its strength. These test results ultimately led Osmose to cease the manufacture and sale of its fire retardant chemicals
 
 
 [12]
 The statement in Pulte's complaint that Osmose "is engaged in the manufacture and sale of ... fire retardant plywood" and that Lowe's and Georgia Pacific sold Pulte substantial quantities of "FRT plywood manufactured by Osmose" has been made by Pulte throughout this litigation, including in Pulte's briefs to this court. This statement is inaccurate; Osmose manufactured the fire retardant chemicals, but it neither manufactured nor sold the FRT plywood. Rather, Lowe's and Georgia Pacific sold the plywood after having treated it with Osmose chemicals
 
 
 [13]
 When instructing the jury, the district court treated the claims for fraud and common law misrepresentation as one
 
 
 [14]
 We reject without discussion Pulte's claims that the district court erred in not submitting Pulte's lost profits claim to the jury and in the refusing to admit certain evidence regarding Pulte's remedial measures and plywood treated with other companies' chemicals
 
 
 [15]
 In its Memorandum in Opposition to Osmose's Motion for Summary Judgment, Pulte argued that "application of Florida conflicts principles permits, indeed compels, the choice of Florida law." Record, vol. 7, at 28, No. 199. The district court, accepting Pulte's choice of law, held that Florida law would apply to Pulte's tort claims. Having urged the court to apply Florida law, Pulte now insists that "if Florida law bars Pulte's claims, then Florida law should not control because Pulte would be entitled to recover under the law of any other arguably relevant jurisdiction." Appellant's Brief at 43. We find no reason to disagree with the district court's choice of law decision. Moreover, Pulte acquiesced in the court's choice of law decision throughout the trial, changing course only after the court granted Osmose's Rule 50(a) motion. Consequently, Pulte waived the choice of law issue and cannot raise that issue on appeal. Patton v. Mid-Continent Sys., Inc., 841 F.2d 742 (7th Cir.1988); see also Haitian Refugee Ctr. v. Civiletti, 614 F.2d 92 (5th Cir.1980) (holding that a party cannot appeal from an injunction to which it agreed). We therefore reject Pulte's assertion that the law of some other state should be applied if Florida's economic loss rule bars its negligence claim
 
 
 [16]
 The Florida Supreme Court also adopted Restatement (Second) of Torts Sec. 552 as the standard for determining liability for negligence in the absence of privity. First Florida Bank v. Max Mitchell & Co., 558 So.2d 9, 16 (Fla.1980) (holding an accountant liable for negligently preparing financial statements, under the unique facts of the case, because of his personal involvement in negotiating the loan and his knowledge of the bank's reliance on the financial statements); see also Bay Garden Manor Condominium Ass'n v. James D. Marks Assocs., 576 So.2d 744 (Fla. 3d Dist.Ct.App.1991) (applying Sec. 552 to allow a negligence action by a condominium association against an engineering firm); First State Sav. Bank v. Albright & Assocs., 561 So.2d 1326 (Fla. 5th Dist.Ct.App.) (adopting Sec. 552 as the standard for appraiser liability), review denied, 576 So.2d 284 (Fla.1990). After the supreme court's decision in Casa Clara, however, courts have been reluctant to extend the application of Sec. 552. See Palau Int'l Traders, Inc. v. Narcam Aircraft, Inc., 653 So.2d 412, 417 (Fla. 3d Dist.Ct.App.1995) (en banc) (refusing to apply Sec. 552 to a negligence suit by the buyer of a used airplane against the seller's airplane mechanic where privity was lacking); see also City of Tampa v. Thornton-Tomasetti, P.C., 646 So.2d 279 (Fla. 2d Dist.Ct.App.1994); Spancrete, Inc. v. Ronald E. Frazier & Assocs., 630 So.2d 1197 (Fla. 3d Dist.Ct.App.1994). As the Palau court explained, "section 552 is a narrow exception to the economic loss rule. Since the Max Mitchell case was decided in 1990, Florida courts have adopted the rationale of section 552 in very limited circumstances." 653 So.2d at 417 (emphasis added). Because the case involved the sale and servicing of goods, which is governed by the Uniform Commercial Code, rather than supplying information as contemplated by Sec. 552, the court held that the economic loss rule barred the negligence claim. Id. at 418. Similarly, we reject Pulte's assertion that Sec. 552 should supplant the economic loss rule in this case
 
 
 [17]
 Pulte argues that the component parts that made up the roof, including the Osmose-treated FRT plywood, somehow reformed to create a separate and distinct entity--the roof system. Accordingly, because the FRT plywood caused the roof system to become unstable, the FRT plywood caused damage to other property. We are not persuaded by Pulte's unsupported, albeit original, interpretation of the other property exception. This exception speaks only to tangible physical objects not to abstract labels conjured up by the fertile minds of dissatisfied purchasers. The FRT plywood did not cease being FRT plywood merely because it was affixed to other roof components
 
 
 [18]
 Osmose read portions of several Pulte employees' depositions into the record at trial. Thomas Joseph Collins, the construction vice president for Pulte's Tampa division, stated that Pulte often hired, on a low bidder basis, subcontractors who were responsible for supplying the building materials. Collins also reported that, in the instances where Pulte purchased its own material, "[t]here was nothing brand specific," and no particular brand of FRT plywood was requested. Record, vol. 36, at 124-25. Rather, Pulte merely "would specify X number of sheets of FRT plywood." Id. at 124. Finally, Collins agreed that Pulte treated FRT plywood like a "commodity." Id. at 125
 Kenneth J. Walker, a Pulte project manager, stated that he "didn't even know that there was more than one brand of fire-retardant plywood." Id. at 127. Walker also echoed Collins' testimony by reporting that he ordered FRT plywood the way he would any other material, e.g., " '[s]end me a bundle of studs, one bundle of CDX plywood and one bundle of fire-retardant plywood.' " Id.
 Finally, David Duggar, Sr., a Pulte vice president, former senior project manager and division manager, answered the following questions regarding his FRT plywood purchases:
 Q: Did you ever ask for a particular brand of FRT?
 A: No. I left that solely up to the lumber supply company.
 Q: Did you have any expectations that you were going to receive a particular brand from that lumber supplier--either of them?
 A: No, sir.
 Q: Did you ever discuss the different brands of plywood--FRT plywood--that were available with the supplier?
 A: No, sir. I left it solely up to them.
 Q: Did it make any difference to you what brand FRT plywood you received?
 A: No, sir.
 Q: Did you review any literature from any of the FRT manufacturers regarding FRT at this same time frame you were ordering it?
 A: No, sir.
 Q: Did it matter to you in any way whatsoever what brand of FRT you received?
 A: No, sir.
 Id. at 130-32.
 
 
 [19]
 In contrast to Osmose's presentation of deposition testimony of several Pulte employees admitting that Pulte viewed FRT plywood as a fungible commodity, Pulte relied on the abbreviated deposition testimony of a single employee, Philip J. Hearn, a former Pulte purchasing agent. The following excerpt of Hearn's deposition was read into the record at trial:
 Q: Do you recall, and I realize this is stretching back aways, of the brochures that you received from Hoover or other parties that you do not recall now? Did you place any reliance on those materials?
 A: Absolutely.
 Q: How so?
 A: Well, the literature was technical information and we used the technical information to be sure the product was satisfactory and met the requirements, the code requirements.
 Record, vol. 36, at 121.
 Immediately after this testimony was offered, Osmose objected because the statements did not relate to Osmose's product. The district court did not rule on the objection, however, stating merely that "[i]t's already been read." Id. Osmose also offered additional deposition testimony in which Hearn stated that he could not specifically recall ever having received or read any product literature on any Osmose chemicals. Id. at 120. Accordingly, Hearn's statement that he "absolutely" relied on the brochures of "Hoover or other parties" plainly is insufficient by itself to establish justifiable reliance on Osmose's promotional literature.