SARATOGA FISHING CO. *v.* J. M. MARTINAC & CO.
ET AL.

No. 95–1764.   Argued February 18, 1997—Decided June 2, 1997

*Keith Zakarin* argued the cause for petitioner. With him on the briefs was *Forrest Booth.*

*Daniel B. MacLeod* argued the cause for respondents. With him on the brief was *Duncan Koler.**

JUSTICE BREYER delivered the opinion of the Court.

The issue before us concerns limits upon the damages that a tort plaintiff in admiralty can recover for physical damage to property caused by a defective product. In *East River*

---

**Steven B. Fisher* and *Michael H. Williamson* filed a brief for All Alaskan Seafoods, Inc., as *amicus curiae* urging reversal.

*Jan S. Amundson, Quentin Riegel,* and *Gregory S. Gilchrist* filed a brief for the National Association of Manufacturers et al. as *amici curiae* urging affirmance.

*S. S. Corp.* v. *Transamerica Delaval Inc.*, 476 U. S. 858 (1986), the Court held that an admiralty tort plaintiff cannot recover for the physical damage the defective product causes to the "product itself"; but the plaintiff can recover for physical damage the product causes to "other property." In this case all agree that the "product itself" consists *at least* of a ship as built and outfitted by its original manufacturer and sold to an initial user. This case asks how this corner of tort law treats the physical destruction of *extra equipment* (a skiff, a fishing net, spare parts) *added* by the initial user after the first sale and then resold as part of the ship when the ship itself is later resold to a subsequent user. Is that added equipment part of the "product itself," in which case the plaintiff cannot recover in tort for its physical loss? Or is it "other property," in which case the plaintiff can recover? We conclude that it is "other property." Hence (assuming other tort law requirements are satisfied) admiralty's tort rules permit recovery.

I

This case arises out of an engine room fire and flood that led to the sinking of the fishing vessel M/V Saratoga in January 1986. We must assume that a hydraulic system defectively designed by respondent Marco Seattle Inc. was one significant cause of the accident. About 15 years before the accident, respondent J. M. Martinac & Co. had built the ship, installed the hydraulic system, and sold the ship new to Joseph Madruga. Madruga then added extra equipment—a skiff, a seine net, and various spare parts—and used the ship for tuna fishing. In 1974, Madruga resold the ship to petitioner, Saratoga Fishing Co., which continued to use the ship for fishing. In 1987, after the ship caught fire and sank, Saratoga Fishing brought this tort suit in admiralty against Marco Seattle and J. M. Martinac.

The District Court found that the hydraulic system had been defectively designed, and it awarded Saratoga Fishing damages (adjusted to reflect Saratoga Fishing's own partial

fault). Those damages included damages for the loss of the equipment that Madruga had added after the initial purchase of the ship.

The Ninth Circuit held that the District Court should not have awarded damages for the added equipment. *Saratoga Fishing Co.* v. *Marco Seattle Inc.*, 69 F. 3d 1432, 1445 (1995). A majority noted that the equipment, though added by Madruga, was part of the ship when Madruga resold the ship to Saratoga Fishing, and, for that reason, the majority held, the added equipment was part of the defective product that itself caused the harm. Applying *East River*'s distinction between the product that itself caused the harm and "other property," the majority concluded that Saratoga Fishing could not recover in tort for the loss. A dissenting judge believed that the "product itself" was the ship when launched into the stream of commerce by Martinac, its original builder. Consequently, the added equipment was "other property." We granted certiorari to resolve this uncertainty about the proper application of *East River*. We now agree with the dissenting judge.

## II

The facts before us show: (1) a Component Supplier who (2) provided a defective component (the hydraulic system) to a Manufacturer, who incorporated it into a manufactured product (the ship), which (3) the Manufacturer sold to an Initial User, who (4) after adding equipment and using the ship, resold it to a Subsequent User (Saratoga Fishing). The applicable law is general maritime law, "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules," drawn from both state and federal sources. *East River, supra,* at 865; see also *Fitzgerald* v. *United States Lines Co.,* 374 U. S. 16, 20 (1963); *Kermarec* v. *Compagnie Generale Transatlantique,* 358 U. S. 625, 630 (1959). The context is purely commercial. The particular question before us requires us to interpret the Court's deci-

sion in *East River:* Does the term "other property," as used in that case, include the equipment added by the Initial User before he sold the ship to the Subsequent User? We conclude that it does: When a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the "product itself" under *East River.* Items added to the product by the Initial User are therefore "other property," and the Initial User's sale of the product to a Subsequent User does not change these characterizations.

*East River* arose at the intersection of two principles that govern recovery in many commercial cases involving defective products. The first principle is that tort law in this area ordinarily (but with exceptions) permits recovery from a manufacturer and others in the initial chain of distribution for foreseeable *physical* harm to property caused by product defects. See Restatement (Second) of Torts § 402A (1965); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 101 (5th ed. 1984); *East River,* 476 U. S., at 867. The second principle is that tort law in this area ordinarily (but with exceptions) does *not* permit recovery for purely economic losses, say, lost profits. See Restatement (Third) of Torts: Products Liability § 6, Comment *d* (Proposed Final Draft, Preliminary Version, Oct. 18, 1996); *e. g., Rardin* v. *T & D Machine Handling, Inc.,* 890 F. 2d 24, 27–30 (CA7 1989). The Court in *East River* favored the second principle, for it held that an injury to the defective product itself, even though physical, was a kind of "economic loss," for which tort law did not provide compensation. 476 U. S., at 871.

The Court reasoned that the loss of the value of a product that suffers physical harm—say, a product that destroys itself by exploding—is very much like the loss of the value of a product that does not work properly or does not work at all. See *id.,* at 870. In all such cases, the Court held, "[c]ontract law, and the law of warranty in particular, is well suited" to setting the responsibilities of a seller of a product

that fails to perform the function for which it was intended. *Id.*, at 872–873. The commercial buyer and commercial seller can negotiate a contract—a warranty—that will set the terms of compensation for product failure. If the buyer obtains a warranty, he will receive compensation for the product's loss, whether the product explodes or just refuses to start. If the buyer does not obtain a warranty, he will likely receive a lower price in return. Given the availability of warranties, the courts should not ask tort law to perform a job that contract law might perform better. *Ibid.; Seely* v. *White Motor Co.*, 63 Cal. 2d 9, 18–19, 403 P. 2d 145, 151 (1965) (en banc).

The Ninth Circuit reasoned that *East River* required it to define the defective "product itself" by looking to that which the plaintiff had purchased, for that is the product that, in principle, the plaintiff could have asked the seller to warrant. Since Saratoga Fishing, the Subsequent User, might have asked Madruga, the Initial User, to warrant the M/V Saratoga, skiff, nets, and all, that product, skiff, nets, and all, is the "product itself" that stands outside the reach of tort recovery. In our view, however, this holding pushes *East River*'s principle beyond the boundary set by the principle's rationale.

For one thing, the Ninth Circuit's holding creates a tort damage immunity beyond that set by any relevant tort precedent that we have found. State law often distinguishes between items added to or used in conjunction with a defective item purchased from a Manufacturer (or its distributors) and (following *East River*) permits recovery for the former when physically harmed by a dangerously defective product. Thus the owner of a chicken farm, for example, recovered for chickens killed when the chicken house ventilation system failed, suffocating the 140,000 chickens inside. *A. J. Decoster Co.* v. *Westinghouse Electric Corp.*, 333 Md. 245, 634 A. 2d 1330 (1994). A warehouse owner recovered for damage to a building caused by a defective roof. *United Air Lines,*

*Inc.* v. *CEI Industries of Ill., Inc.*, 148 Ill. App. 3d 332, 499 N. E. 2d 558 (1986). And a prior case in admiralty (not unlike the one before us) held that a ship charterer, who adds expensive seismic equipment to the ship, may recover for its loss in a fire caused by a defective engine. *Nicor Supply Ships Assocs.* v. *General Motors Corp.*, 876 F. 2d 501 (CA5 1989). Indeed, respondents here conceded that, had the ship remained in the hands of the Initial User, the loss of the added equipment could have been recovered in tort. See Tr. of Oral Arg. 29–30. We have found no suggestion in state (or in federal) law that these results would change with a subsequent sale—that is, we have found no case, other than the Ninth Circuit case before us, that suggests that the courts would deny recovery to a subsequent chicken farmer, who had later purchased the farm, chickens, coop, ventilation system, and all.

Indeed, the denial of recovery for added equipment simply because of a subsequent sale makes the scope of a manufacturer's liability turn on what seems, in one important respect, a fortuity, namely, whether a defective product causes foreseeable physical harm to the added equipment before or after an Initial User (who added the equipment) resells the product to a Subsequent User. One important purpose of defective-product tort law is to encourage the manufacture of safer products. The various tort rules that determine which foreseeable losses are recoverable aim, in part, to provide appropriate safe-product incentives. And a liability rule that diminishes liability simply because of some such resale is a rule that, other things being equal, diminishes that basic incentive. That circumstance requires a justification. That is to say, why should a series of resales, after replacement and additions of ever more physical items, progressively immunize a manufacturer to an ever greater extent from the liability for foreseeable physical damage that would otherwise fall upon it?

The *East River* answer to this question—because the parties can contract for appropriate sharing of the risks of harm—is not as satisfactory in the context of resale after an initial use. That is because, as other courts have suggested, the Subsequent User does not contract directly with the manufacturer (or distributor). Cf. *Peterson* v. *Idaho First Nat. Bank*, 117 Idaho 724, 727, 791 P. 2d 1303, 1306 (1990); *Tillman* v. *Vance Equipment Co.*, 286 Ore. 747, 755–756, 596 P. 2d 1299, 1304 (1979). Moreover, it is likely more difficult for a consumer—a commercial user and reseller—to offer an appropriate warranty on the used product he sells akin to a manufacturer's (or distributor's) warranty of the initial product. The user/reseller did not make (or initially distribute) the product and, to that extent, he normally would know less about the risks that such a warranty would involve. Cf. *Tillman, supra*, at 755, 596 P. 2d, at 1303–1304; *Peterson, supra*, at 726–727, 791 P. 2d, at 1305–1306. That is to say, it would seem more difficult for a reseller to warrant, say, a ship's engine; as time passes, the ship ages, the ship undergoes modification, and it passes through the hands of users and resellers.

Of course, nothing prevents a user/reseller from offering a warranty. But neither does anything prevent a Manufacturer and an Initial User from apportioning through their contract potential loss of any other items—say, added equipment or totally separate physical property—that a defective manufactured product, say, an exploding engine, might cause. No court has thought that the mere possibility of such a contract term precluded tort recovery for damage to an Initial User's other property. Similarly, in the absence of a showing that it is ordinary business practice for user/resellers to offer a warranty comparable to those typically provided by sellers of new products, the argument for extending *East River*, replacing tort law with contract law, is correspondingly weak. That is to say, respondents have not explained why the ordinary rules governing the manufacturer's tort

liability should be supplanted merely because the user/ reseller may in theory incur an overlapping liability in contract.

Respondents make two other important arguments. First, they say that our reasoning proves too much. They argue that, if a Subsequent User can recover for damage a defective manufactured product causes to property added by the Initial User, then a user might recover for damage a defective component causes the manufactured product, other than the component itself. Saratoga Fishing, for example, could recover the damage the defective hydraulic system caused to any other part of the ship. But the lower courts, following *East River*, have held that it is not a component part, but the vessel—as placed in the stream of commerce by the manufacturer and its distributors—that is the "product" that itself caused the harm. See *Shipco 2295, Inc.* v. *Avondale Shipyards, Inc.*, 825 F. 2d 925, 928 (CA5 1987); see also, *e. g.*, *National Union Fire Ins. Co. of Pittsburgh* v. *Pratt & Whitney Canada, Inc.*, 107 Nev. 535, 539–542, 815 P. 2d 601, 604–605 (1991). As the Court said in *East River*:

> " 'Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of "property damage" in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability.' " 476 U. S., at 867 (quoting *Northern Power & Engineering Corp.* v. *Caterpillar Tractor Co.*, 623 P. 2d 324, 330 (Alaska 1981)).

Our holding here, however, does not affect this rule, for the relevant relations among initial users, manufacturers, and component suppliers are typically different from those at issue here. Initial users, when they buy, typically depend upon, and likely seek warranties that depend upon, a manufacturer's primary business skill, namely, the assembly of workable product components into a marketable whole.

*King* v. *Hilton-Davis*, 855 F. 2d 1047, 1052 (CA3 1988); *Shipco 2295, supra,* at 929; *National Union Fire Ins., supra,* at 541, 815 P. 2d, at 605. Moreover, manufacturers and component suppliers can allocate through contract potential liability for a manufactured product that does not work, thereby ensuring that component suppliers have appropriate incentives to prevent component defects that might destroy the product. *King, supra,* at 1054; cf. *Shipco 2295, supra,* at 930. There is no reason to think that initial users systematically control the manufactured product's quality or, as we have said, systematically allocate responsibility for user-added equipment, in similar ways. Regardless, the case law does suggest a distinction between the components added to a product by a manufacturer before the product's sale to a user, *e. g., Airlift Int'l, Inc.* v. *McDonnell Douglas Corp.,* 685 F. 2d 267 (CA9 1982); *King, supra; Shipco 2295, supra;* and those items added by a user to the manufactured product, *e. g., Nicor Supply Ships Assocs.* v. *General Motors Corp.,* 876 F. 2d 501 (CA5 1989); and we would maintain that distinction.

Second, respondents argue that our holding would impose too great a potential tort liability upon a manufacturer or a distributor. But we do not see how that is so. For one thing, a host of other tort principles, such as foreseeability, proximate cause, and the "economic loss" doctrine, already do, and would continue to, limit liability in important ways. For another thing, where such principles are satisfied, liability would exist anyway had the manufactured product simply remained in the hands of the Initial User. Our holding merely maintains liability, for *equipment added* after the initial sale, despite the presence of a resale by the Initial User.

We conclude that equipment added to a product after the Manufacturer (or distributor selling in the initial distribution chain) has sold the product to an Initial User is not part of the product that itself caused physical harm. Rather, in *East River's* language, it is "other property." (We are

speaking, of course, of added equipment that itself played no causal role in the accident that caused the physical harm.) Thus the extra skiff, nets, spare parts, and miscellaneous equipment at issue here, added to the ship by a user after an initial sale to that Initial User, are not part of the product (the original ship with the defective hydraulic system) that itself caused the harm.

The decision of the Ninth Circuit is

*Reversed.*

JUSTICE O'CONNOR, dissenting.

I do not disagree with our decision to grant certiorari in this case, but I agree with JUSTICE SCALIA—and for the reasons he states—that we should affirm the judgment of the Court of Appeals.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

In *East River S. S. Corp.* v. *Transamerica Delaval Inc.*, 476 U. S. 858 (1986), we adopted as part of admiralty law the so-called "economic loss" rule, which denies the purchaser of a defective product a tort action against the seller or manufacturer for purely economic losses sustained as a result of the product's failure. Applying this rule, we held that a plaintiff may not recover in tort when a defective product damages only itself, but may recover for personal injuries and for damage to other property. See *id.*, at 871–875. The present case involves a relative detail of application of the *East River* holding: whether, and under what circumstances, "other property" can include property added to the defective product, not by the plaintiff-purchaser himself, but by some earlier purchaser in the chain of ownership leading back to the manufacturer. In the context of the present case, the question is whether a skiff, a net, and communications and navigational electronics added by Joseph Madruga to the M/V Saratoga before she was sold to petitioner constitute

part of the product itself (for which recovery is not available) or "other property" (for which recovery is available).

It would have been better, in my view, not to grant certiorari in this case. By the time *East River* was decided, we had a wealth of lower court development to draw upon, including well-reasoned opinions taking no less than three distinct positions on the economic-loss rule. See *id.*, at 868–871. We could be confident in our decision, knowing that it broke little new ground; the rule we adopted had been endorsed by a majority of state courts and had been tested for two decades since its enunciation by Chief Justice Traynor in *Seely* v. *White Motor Co.*, 63 Cal. 2d 9, 403 P. 2d 145 (1965). In the present case, by contrast, the Court sets sail into uncharted seas. Not a single lower court decision (other than the one under review) has addressed the precise question presented: the status as "other property" of additions made by a prior purchaser who was a user. I would feel less uncomfortable about our plying these unknown waters if we were skilled navigators. But unlike state courts, we have little first-hand experience in the development of new common-law rules of tort and contract governing commercial transactions. Better to have followed some state-court pilots than to proceed on our own—and even, perhaps, to lead state courts aground. With this disclaimer, and with the admission that I am only modestly more confident of my resolution of this case than I am of the Court's, I proceed (reluctantly) to discussion of the merits.

The Court's opinion suggests that this is a rather straightforward case. The relevant facts—according to the Court—are quite simple, showing: "(1) a Component Supplier who (2) provided a defective component . . . to a Manufacturer, who incorporated it into a manufactured product (the ship), which (3) the Manufacturer sold to an Initial User, who (4) after adding equipment and using the ship, resold it to a Subsequent User." *Ante*, at 878. What the Court's opinion does not disclose is that Madruga—the Court's "Initial

User"—was perhaps not only a user of the boat but also an entrepreneur in the business of designing, assembling, and distributing what might be described as "fully equipped tuna-fishing machines." The M/V Saratoga was not an isolated purchase by tuna-fisherman Madruga from Martinac, but was the third of seven steel-hull tuna seiners Madruga commissioned. She was designed, in part by Madruga, specifically for use as a tuna seiner, and her construction at Martinac's shipyard was supervised personally by Madruga and by an engineer in Madruga's employ. Madruga negotiated over the specifications and equipment for the vessel and ordered numerous changes to it during the course of construction. When delivered by Martinac, the M/V Saratoga was certainly functional as a boat, but it was not yet capable of performing the task for which it was specially designed. It was arguably still just a component of a larger tuna-fishing machine that would not be complete until Madruga installed the seine, skiff, and electronic equipment; and arguably a component of a tuna-fishing machine that Madruga was in the business of marketing.

As respondents point out, there is no finding in the record as to whether Madruga was engaged in the business of selling such products and the issue was never raised or considered. Brief for Respondents 33, n. 28. I assume that the Court disregards this issue (neither resolving it nor remanding for its consideration) because the Court deems the question irrelevant. Under the Court's test, as I understand it, the "product" is fixed when it is sold to an "Initial User," even if that user is also in the business of modifying and reselling the product. In my view, there is little to recommend such a rule.

The Court is driven to take the position it does by the concern that liability would otherwise turn on "a fortuity, namely, whether a defective product causes . . . harm to the added equipment before or after an Initial User (who added the equipment) resells the product to a Subsequent User."

*Ante,* at 881. But the initial-user rule the Court embraces simply makes liability turn on a different fortuity, namely, whether the person who adds additional equipment to the product uses that product before selling it. If Madruga was engaged in the business of assembling and distributing tuna seiners, why should the fact that he briefly used the vessel before selling it enable petitioner to obtain tort damages that would plainly not be recoverable if Madruga had simply installed the components and sold the vessel? Or put in more commonplace terms: Why should the buyer of a car whose engine catches fire and destroys the entire vehicle be able to recover in a tort action against the manufacturer for the value of the dealer-added hi-fi stereo system if the car was a "demo," but not if the car was brand new?

One rule that generally avoids making liability turn on either of the above described "fortuities" is what might be called the "last-402A-seller rule." Under this rule, the "product" would be fixed when it is sold by the last person in the chain of distribution who is, in the words of § 402A of the Restatement (Second) of Torts (1964), "engaged in the business of selling such a product." This would offer at least as much predictability as can be expected from the Court's approach, would ensure that the availability of tort remedies will be uniform with regard to all end-users, and would avoid making liability turn on the seemingly irrelevant question whether the distributor of the product used it before sale. The last-402A-seller rule is also more consistent with one of the principal considerations underlying our decision in *East River:* the desirability of invoking tort protection only where contract-warranty protection is infeasible. Defining the product as what was sold by the last person engaged in the business of selling such products denies tort recovery for those additions to the originally manufactured product which the purchaser could have covered by warranty protection (persons in the business will generally offer

warranties covering the entire product; user-sellers will generally not).

The last-402A-seller rule appears to me superior to the initial-user rule adopted by the Court today, but the two are in reality quite similar and will in most cases produce the same result. Each essentially attempts to differentiate between additions made before and after the product has left the market chain of distribution. I doubt, however, whether leaving the market chain of distribution ought to be so momentous an event for the purpose at hand. So long as the plaintiff is a commercial entity (and I understand the rule under consideration to be one applicable only to commercial, as opposed to consumer, transactions, see *ante,* at 878–879) it seems to me to make no difference whether the purchase was made from a "402A seller" or not. Commercial entities do not typically suffer, at the time they make their purchase, a disparity in bargaining power that makes it impossible for them to obtain warranty protection on the entire product; nor are they unable to insure the product they have purchased, including those portions of it added by upstream owners. Our decision in *East River* suggests that in such circumstances there is inadequate reason to interfere with private ordering by importing tort liability—that is, inadequate reason to permit the purchaser to recover *any* tort damages for loss of the product *he* purchased. See *East River,* 476 U. S., at 872–873.

In recognition of that reality, an impressive line of lower court decisions, applying both federal and state law, has held that the purchaser of a product damaged by a defective component cannot recover in tort against the manufacturer of the component on the theory that the remainder of the product is "other property." See, *e. g., Pulte Home Corp.* v. *Osmose Wood Preserving, Inc.,* 60 F. 3d 734, 741–742 (CA11 1995) (Florida law); *American Eagle Ins. Co.* v. *United Technologies Corp.,* 48 F. 3d 142, 144–145 (CA5 1995) (Texas law);

*Transport Corp. of America, Inc.* v. *International Business Machines Corp.,* 30 F. 3d 953, 957 (CA8 1994) (Minnesota law); *King* v. *Hilton-Davis,* 855 F. 2d 1047, 1051–1053 (CA3 1988) (Pennsylvania law), cert. denied, 488 U. S. 1030 (1989); *Shipco 2295, Inc.* v. *Avondale Shipyards, Inc.,* 825 F. 2d 925, 928–929 (CA5 1987) (federal maritime law), cert. denied, 485 U. S. 1007 (1988). Although the holdings of these cases are not precisely on point (since the plaintiff was the initial purchaser-user of the defective product), the rationale of those decisions is in tension with the Court's holding today, and supports what might be called an "object-of-the-bargain" rule. They rest on the premise that one must look to the product purchased or bargained for by the plaintiff in determining whether additions constitute "other property." See, *e. g., King, supra,* at 1051 ("In determining whether a product 'injures only itself' for purposes of applying the *East River* rule . . . [one must] look to the product purchased by the plaintiff"); *Shipco 2295, supra,* at 928; *American Eagle, supra,* at 145; *Casa Clara Condominium Assn.* v. *Charley Toppino and Sons, Inc.,* 620 So. 2d 1244, 1247 (Fla. 1993) ("The character of a loss determines the appropriate remedies, and, to determine the character of a loss, one must look to the product purchased by the plaintiff, not the product sold by the defendant"); see also Fox & Loftus, Riding the Choppy Waters of East River: Economic Loss Doctrine Ten Years Later, 64 Def. Couns. J. 260, 264, n. 29 (1997) (citing numerous other cases and observing that "[t]he trend in defining 'economic loss' is to focus on what the plaintiff purchased rather than what the defendant agreed to provide"). These courts have adopted this purchaser-oriented approach on the belief, which I think correct, that it is in accord with the policy judgments underlying our decision in *East River.* As the Third Circuit in *King* explained:

"As we read *East River,* it is the character of the plaintiff's loss that determines the nature of the available remedies. When loss of the benefit of a bargain is

the plaintiff's sole loss, the judgment of the Supreme Court was that the undesirable consequences of affording a tort remedy in addition to a contract-based recovery were sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims. The relevant bargain in this context is that struck by the plaintiff. It is that bargain that determines his or her economic loss and whether he or she has been injured beyond that loss." 855 F. 2d, at 1051.

There are undoubtedly other rules that can be—and have been—conceived of. One recent article describes the current state of the law regarding damage to "other property" on construction projects as follows:

"There has been a growing trend in many jurisdictions to interpret 'economic loss' broadly to include damage that formerly was considered 'other property.' Courts that follow this trend have utilized the following rationales:

"• There is no damage to 'other property' where the damage extends only to property within the confines of the bargain. . . . 'Other property' does not include damage to property if those losses are direct and consequential losses that were within the contemplation of the parties and could have been the subject of negotiations between the parties.

"• The phrase 'other property' does not include the type of property that one would reasonably expect, on a foreseeability test, to be damaged as a direct consequence of the failure of the product at issue.

"• No 'other property' has been damaged, because the allegedly defective product has been incorporated into the structure that has been damaged.

"• Losses caused by the inferior quality of the product must be considered 'economic' and therefore cannot be

considered 'property.'" Fox & Loftus, *supra*, at 265–266 (footnotes omitted).

And there can of course be combinations of the various rules. For example, one might adopt an "integrated unit" exception to the initial-user rule that the Court announces today.

As I have confessed above, I have little confidence in my ability to make the correct policy choice in an area where courts more experienced than we have not yet come to rest. I would have been inclined to let the lower federal courts struggle with this issue somewhat longer, in the hope that there would develop a common-law consensus to which we could refer for our admiralty rule, as we did in *East River*. Put to a choice, however, I would not select the rule adopted by the Court today. I would adopt the rule proposed by respondents and define the "product" for purposes of *East River*'s economic-loss rule as the object of the purchaser's bargain. That was essentially the approach followed by the Court of Appeals below, and I would accordingly affirm its judgment.

I respectfully, and indeed diffidently, dissent.