**RODMAN INDUSTRIES, INC.,
Plaintiff–Appellant,**

v.

**G & S MILL, INC., and Liberty Mutual
Insurance Co., Defendants–
Appellees.**

**No. 97–3525.**

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1998.

Decided May 28, 1998.

Paul E. Benson (argued), Michael, Best & Friedrich, Milwaukee, WI, for Rodman Industries, Inc.

Vicki L. Arrowood (argued), Kasdorf, Lewis & Swietlik, Milwaukee, WI, Charles J. O'Malley, Johnson, O'Malley & Harvey, Boston, MA, for G & S Mill, Inc.

Vicki L. Arrowood, James M. Ryan, Kasdorf, Lewis & Swietlik, Milwaukee, WI, for Liberty Mutual Insurance Company.

Before BAUER, FLAUM, and DIANE P. WOOD, Circuit Judges.

FLAUM, Circuit Judge.

Rodman Industries (Rodman) hired G & S Mill, Inc. (GSM) to retrofit the exhaust system on its boiler to bring it into compliance with Wisconsin's environmental emissions standards. The boiler is used to incin-

erate dust and other waste generated by Rodman's particleboard manufacturing business. Despite contractual guarantees by GSM to bring the boiler into compliance, as well as extended delays while GSM struggled to fulfill its promises, the boiler never met the emissions standards. Rodman sued GSM and GSM's insurer, Liberty Mutual, for negligence pursuant to the court's diversity jurisdiction. The district court entered summary judgment for the defendants on Rodman's negligence claim, holding that the Wisconsin economic loss doctrine barred the company's tort action in this case. We affirm.

## I.

In November and December 1992, the Wisconsin Department of Natural Resources tested Rodman's boiler and determined that it did not comply with state emissions standards. Rodman approached GSM—a Massachusetts corporation that manufactures and retrofits wood-fired furnaces, boilers, and incinerators—about the possibility of retrofitting the boiler system. The parties subsequently entered into a contract by which GSM agreed to replace the existing exhaust system and other components to bring the boiler into compliance. The contract described GSM's work as a "turnkey installation" of the retrofitted system. GSM was to provide the necessary materials and hire and supervise the subcontractors doing the actual construction; Rodman's obligation (aside from payment of $210,000) was primarily to allow GSM access to the boiler from mid-April to mid-May, when the work would be completed. GSM warranted that the retrofitted boiler would meet the state emissions standards. The contract also contained a limited warranty provision that stated:

> All equipment manufactured by [GSM] is warranted to [Rodman] against defects in materials and workmanship for a period of one (1) year.... [GSM] shall not be liable for any incidental, consequential, or other damages of whatever nature whether or not occasioned by the equipment regardless of when the same occurs or arises in excess of $500,000.

Unfortunately, GSM never was able to fulfill its promise to bring the boiler into compliance. Rodman alleges that GSM's nonperformance stemmed from its negligent failure to test the particleboard material used by Rodman to fuel the boiler, which would have revealed that the fuel did not burn in exactly the same manner as natural wood. Accordingly, in addition to suing GSM for misrepresentation, breach of contract, and breach of implied warranties of merchantability and fitness for a particular purpose, Rodman also added a claim of negligence. Rodman joined GSM's insurer, Liberty Mutual, as a defendant to the negligence count. The magistrate judge entered summary judgment in favor of GSM and Liberty Mutual on the negligence claim because it found that the claim was barred by Wisconsin's economic loss doctrine. The district court affirmed the magistrate's decision. Believing that GSM would be unable to satisfy any significant money judgment, Rodman then voluntarily dismissed its claims arising under the contract in order to pursue its appeal of the district court's ruling on the negligence claim against GSM and Liberty Mutual as a final judgment.

## II.

■ This case turns on whether the Wisconsin economic loss doctrine bars Rodman's negligence claim against GSM and Liberty Mutual for damages resulting from Rodman's inability to use its boiler. Rodman alleges damages consisting of the costs of obtaining natural gas to fuel its stand-by and temporary boilers; the costs of landfilling the particleboard sawdust and other waste that it could no longer use to fuel its boiler; the cost of renting and operating a temporary boiler; and the cost of purchasing a new knock-out box and baghouse system.

■ We review the district court's entry of summary judgment *de novo*, making all inferences in favor of the nonmoving party. *See Aubert v. American Gen. Fin.*, 137 F.3d 976, 977 (7th Cir.1998). In evaluating the viability of Rodman's negligence action, we apply the substantive law of Wisconsin. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In doing so,

we must predict how the Wisconsin Supreme Court would decide the issues presented. *See Boland v. Engle,* 113 F.3d 706, 710 (7th Cir.1997). In the absence of guidance from the Wisconsin Supreme Court, we examine the decisions of the lower state courts. *See King v. Damiron Corp.,* 113 F.3d 93, 95 (7th Cir.1997).

■ "The economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely 'economic' in nature." *Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis.2d 394, 573 N.W.2d 842, 844–45 (1998) (citing *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis.2d 910, 437 N.W.2d 213, 217 (1989)).

■ Economic loss includes the "loss of bargain", meaning "the difference in value between what is given and received", and it also includes "all indirect loss, such as loss of profits resulting from inability to make use of the defective product." *Daanen & Janssen,* 573 N.W.2d at 845 (quoting *Northridge Co. v. W.R. Grace & Co.,* 162 Wis.2d 918, 471 N.W.2d 179, 181–82 (1991)). Economic loss does not, however, encompass damages based on personal injury or damage to property other than the purchased product itself. Thus, "[i]n short, economic loss is damage to a product itself or monetary loss caused by the defective product, which does not cause personal injury or damage to other property." *Daanen & Janssen,* 573 N.W.2d at 845.

Rodman admits that it and GSM are both commercial parties and that a contract governed the relationship between them.[1] Furthermore, Rodman's damages—the costs incurred as a result of the boiler being out of commission—constitute indirect losses "resulting from inability to make use of the defective product." *Daanen,* 573 N.W.2d at 845. All of these factors counsel in favor of application of the economic loss doctrine to

bar Rodman's claim. Rodman contends, however, that its negligence claim is still viable because its contract with GSM was for services rather than for the purchase of a product.

Although some lower federal courts interpreting Wisconsin law have applied the economic loss doctrine in cases involving contracts for the provision of services, *see Stoughton Trailers, Inc. v. Henkel Corp.,* 965 F.Supp. 1227, 1233–35 (W.D.Wis.1997) (negligent design of a truck-painting system); *Wausau Paper Mills Co. v. Chas. T. Main, Inc.,* 789 F.Supp. 968, 974 (W.D.Wis.1992) (negligent performance of engineering and design services for a paper mill), some lower state courts appear to have taken the opposite position. *See Hap's Aerial Enter. v. General Aviation Corp.,* 173 Wis.2d 459, 496 N.W.2d 680, 683–84 (1992) (negligent airplane inspection), overruled on other grounds by *Daanen & Janssen,* 573 N.W.2d at 851 & n. 8; *Milwaukee Partners v. Collins Eng'rs,* 169 Wis.2d 355, 485 N.W.2d 274, 276–77 & n. 3 (negligent building inspection), review denied, 491 N.W.2d 767 (Wis.1992). The Wisconsin Supreme Court expressly reserved comment on this issue in *Daanen & Janssen. See* 573 N.W.2d at 851–52. ("[W]e have not addressed nor do we address here whether the doctrine applies with equal force to damages resulting from the provision of services."). *But see A.E. Inv. Corp. v. Link Builders,* 62 Wis.2d 479, 214 N.W.2d 764 (1974) (holding that an architect whose negligent design and supervision of construction render a building unfit for use may be liable in tort to a commercial tenant who suffers economic loss as a result). For the purposes of this case, we do not need to predict how the Wisconsin Supreme Court would ultimately decide this issue. Although the contract did provide that GSM would perform some ancillary design and engineering services, the main thrust of the deal was the purchase of a retrofitted boiler that would comply with state emissions standards.

1. Although the economic loss doctrine typically is invoked to bar tort claims when, as in this case, a warranty or other contract is in place, *see Sunnyslope,* 437 N.W.2d at 217, the Wisconsin Supreme Court recently made it clear that the economic loss doctrine may apply even though the parties are not in privity of contract. *See Daanen,* 573 N.W.2d at 852. *But see Hap's Aerial Enter., Inc. v. General Aviation Corp.,* 173 Wis.2d 459, 496 N.W.2d 680, 682 n. 4 (1992) (predicting the opposite result).

The contract describes the deal between the parties as a "turnkey installation." Rodman was to provide access to the relevant areas and let GSM do its work; when GSM emerged, Rodman was to have a newly-compliant boiler. The work performed on the boiler was extensive and consisted of more than the mere addition of a new component or ancillary equipment. *Compare Saratoga Fishing Co. v. J.M. Martinac & Co.*, — U.S. ——, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) (characterizing a skiff, fishing net, and spare parts added to a fishing vessel as "other property" separate from the vessel itself). This newly-compliant boiler, to be sure, was built on the foundation of the existing boiler. But this does not alter our conclusion that Rodman contracted for a product and not just for services. GSM's role was not limited to an advisory capacity. It did more than merely suggest ways to adapt the boiler or invent a design for Rodman to implement. GSM did perform the design work, but it also provided the materials, hired the subcontractors, and supervised the actual construction of the new system. Rodman argues that the transaction in this case cannot be characterized as a purchase of a product because it already owned the boiler, which GSM merely modified. If Rodman had hired GSM to design and build a compliant boiler from scratch, however, there would be no doubt that this would constitute a purchase contract. We fail to discern any meaningful distinction in the mere fact that GSM built onto the existing boiler rather than construct one from scratch.[2]

Furthermore, the policy rationales underlying the economic loss doctrine, as identified by the Wisconsin Supreme Court, support an application of the doctrine to this case. According to the Supreme Court:

> Application of the economic loss doctrine to tort actions between commercial parties is generally based on three policies . . .:(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

*Daanen & Janssen*, 573 N.W.2d at 846. Here, allowing Rodman to seek tort remedies to compensate for its frustrated expectations under the contract would obviate the distinction between the realm of tort-and its "concerns with unreasonably dangerous products or public safety", *id.* at 847—and the realm of contract, which serves to "protect the expectancy interests of parties to private bargained-for agreements." *Id.* at 846. Rodman's suit does not implicate the safety concerns that the Wisconsin Supreme Court in *Daanen & Janssen* associated with tort suits; Rodman's injury resides solely in its lack of satisfaction with GSM's performance under the contract. Rodman's suit therefore sounds in contract, not in tort, and allowing Rodman to proceed under its negligence claim would undermine the distinction that Wisconsin seeks to preserve between these two areas of the law.

Permitting a tort suit under these circumstances would also frustrate the ability of commercial parties to rely on their contracts

---

**2.** It is notoriously difficult to identify the point at which modifications to an existing device become so extensive that the device itself is transformed into a different product:

> Another complication again concerns the relation between a complex thing and the various parts of which it is composed. It is true of some of these things, though not true of all, that their continued existence need not involve the continued existence of their components. Suppose that a wooden ship is repaired from time to time while it is floating in harbour, and that after fifty years it contains none of the bits of wood out of which it was first built. It is still one and the same ship, because, as a ship, it has displayed throughout these fifty years full physical continuity. This is so despite the fact that it is now composed of quite different bits of wood.

Derek Parfit, Reasons and Persons 203–04 (1986). *See also· Saratoga Fishing Co.*, — U.S. at ——, 117 S.Ct. at 1790 (Scalia, J., dissenting) (arguing that the fishing vessel itself was "arguably still just a component of a larger tuna-fishing machine that would not be complete until [the Initial User] installed the seine, skiff, and electronic equipment"). Determinations of this sort must be made on a case-by-case basis. Here, we are confident that the work performed on the boiler by GSM was extensive enough to constitute the construction of a new product built on the foundation of the existing boiler.

to allocate risks. GSM had every reason to believe that its contract with Rodman—and particularly the limited warranty provisions—limited its liability in the event that the boiler did not perform as expected. Rodman's negligence suit, if allowed to stand, would make the contractual allocation of risk between GSM and Rodman virtually meaningless, as Rodman would merely seek in tort those remedies denied under the contract. *See Daanen & Janssen,* 573 N.W.2d at 847 ("As a matter of policy, in situations in which commercial parties have allocated their respective risks through contract, 'the economic loss doctrine teaches that it is more appropriate to enforce that bargain than to allow an end run around the bargain through tort law.' ") (quoting *Stoughton Trailers v. Henkel Corp.,* 965 F.Supp. 1227, 1234 (W.D.Wis. 1997)).

In addition, as between these two parties, Rodman was in the better position to identify its risk of economic loss in the event that the boiler did not work as expected. Knowing this risk, Rodman could have safeguarded against it by purchasing insurance, arranging for a temporary boiler or taking other precautions, or negotiating a more favorable contract under which GSM would have assumed more of the risk. Limiting Rodman to its contractual remedies in this case promotes Wisconsin's policy of placing the onus of risk-allocation on the party with the best information and capacity to deal with that risk. *See Daanen & Janssen,* 573 N.W.2d at 849 ("Even if a commercial purchaser cannot detect product failures before they occur, it can at least anticipate problems and insure against them through purchasing insurance or allocating risk by contract."); *see also Rardin v. T & D Mach. Handling, Inc.,* 890 F.2d 24, 26–27 (7th Cir.1989) (discussing *Hadley v. Baxendale,* 156 Eng. Rep. 145 (1854), in the context of the economic loss doctrine).

 As a final matter, we must also reject Rodman's claim that its negligence suit is actionable under the "other property" exception to the economic loss doctrine. This exception allows for tort suits when the allegedly defective product damages other property owned by the purchaser. For instance,

in *Tony Spychalla Farms v. Hopkins Agricultural Chemical Company,* 151 Wis.2d 431, 444 N.W.2d 743, *review denied,* 446 N.W.2d 285 (Wis.1989), the court held that the economic loss doctrine did not bar a products liability suit that alleged that a defective product (a pesticide, in that case) harmed other property belonging to the plaintiff, namely, the potato crop. *See also Saratoga Fishing Co. v. J.M. Martinac & Co.,* —— U.S. ——, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) (holding that nets and other equipment added to a defective fishing vessel were "other property" for which recovery in tort was available when the ship caught fire and sank). Rodman asserts that the rule in *Spychalla* governs here because the additions made to the boiler by GSM damaged Rodman's other property—*i.e.,* the boiler itself— by taking the boiler out of commission.

The main flaw in this argument is that no harm actually befell the boiler. Even if we accepted the proposition that the original boiler could constitute "other property" separate from GSM's modifications, the "other property" exception only applies when the property suffers some damage or harm. *See, e.g., Northridge Co. v. W.R. Grace & Co.,* 162 Wis.2d 918, 471 N.W.2d 179, 183 (1991) (applying the "other property" exception where the plaintiffs alleged that installation of fireproofing material containing asbestos in the plaintiffs' building "has physically harmed the property [i.e., the building] causing an unreasonable risk to health and safety"). Here, Rodman apparently concedes that the boiler worked as well—or, in terms of the emissions standards, as poorly—at the end of the retrofitting process as it did prior to that process. Rodman may indeed have been harmed by the loss of use of its boiler, but the boiler itself was not harmed by GSM's work.

We therefore affirm the decision below barring Rodman's negligence action against GSM and Liberty Mutual.