**Karen M. JURGENSEN,**
**et al., Plaintiffs**

**v.**

**ALBIN MARINE, INC.,**
**et al., Defendants**

**No. CIV.AMD 01–340.**

United States District Court,
D. Maryland.

Aug. 27, 2002.

H. Allen Black, III, Ober Kaler Grimes and Shriver, Baltimore, MD, Eugene R. Fidell, Feldesman Tucker Leifer Fidell and Bank LLP, Washington, DC, for Plaintiff.

Dale B. Garbutt, Sandra Harlen Benzer, Whiteford Taylor and Preston, Baltimore, MD, Randell Hunt Norton, Brooke Pinkerton, Tamika L. Taylor, Thompson

O'Donnell Markham Norton and Hannon, Washington, DC, Kevin M. Murphy, Carr Maloney PC, James P. Steele, Law Office, Washington, DC, for Defendants.

## MEMORANDUM

DAVIS, District Judge.

On September 24, 1999, the newly-purchased Pleasure Craft MARITA II, an Albin 33 + 3 Express Trawler, sank in the Chesapeake Bay with its owners, plaintiffs Karen M. Jurgensen and William Leary, aboard. Consequently, plaintiffs instituted this damages action alleging theories of negligence, breach of warranty, and strict products liability. Plaintiffs have sued the entities they contend were involved in the manufacture and sale of the vessel, namely, Albin Marine, Inc., and Albin Manufacturing, Inc. (together "Albin"); Albin on the Chesapeake, LLC ("AOC"); and A & S Development, LLC, d/b/a Chesapeake Motoryacht Sales ("A & S").* The sole individual defendant, Brent Albright, was apparently the actual salesperson who negotiated the sale of the vessel to plaintiffs. As discussed *infra*, Albright is also said to be a principal of AOC. The case is here under the admiralty jurisdiction, *see* 28 U.S.C. § 1333, as well as diversity of citizenship. *See* 28 U.S.C. § 1332.

Now pending, *inter alia*, is A & S's motion for summary judgment. A & S contends that plaintiffs' claims fail as a matter of law as to defendant A & S because, although A & S allowed its "letterhead" to be used in connection with the purchase and sale of plaintiffs' vessel, A & S was not materially involved in the transaction. I have given careful attention to the parties' memoranda and exhibits, and a hearing is not needed. Local Rule 105.6.

For the reasons explained below, I shall deny A & S's motion for summary judgment.

(i)

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548;

---

* The amended complaint incorrectly named A & S Development, LLC, and "Chesapeake Motoryacht Sales" as separate entities. The parties now agree that, although *Chesapeake Motoryacht Sales, Inc.*, formerly was a Maryland corporation, at all times relevant to this case, the designation *Chesapeake Motoryacht Sales* has been merely a trade name of A & S. A & S's Mot. for Summ. J. ("A & S's Mot."), 3 n. 1; Pls.' Op. to A & S's Mot. ("Pls.' Op."), 2.

*Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

(ii)

In considering A & S's motion for summary judgment, I view the facts in the light most favorable to plaintiffs, and I shall draw all reasonable inferences in favor of plaintiffs.

Arthur and Susan Malsin are the principals of A & S. In April 1997, A & S purchased from Chesapeake Motoryacht Sales, Inc., the right to act as a dealer for Albin, the dealership covering an area which included the Chesapeake Bay. *See Pls.' Ex.* 1. As an Albin dealer, A & S had numerous contractual responsibilities, including but not limited to the promotion and sale of Albin's products, maintenance of an inventory of Albin's products, performance of inspection and other services, and maintenance of records. *Pls.' Ex.* 1, ¶ 3. Under the dealer agreement, neither the rights of the dealer nor Albin were assignable without the written consent of each party. *Id.* ¶ 17. Along with the dealership rights, the Malsins also acquired the trade name "Chesapeake Motoryacht Sales." On June 3, 1997, the Malsins' entity, A & S, registered the trade name "Chesapeake Motoryacht Sales." *Pls.' Ex.* 2. In January 1998, A & S commissioned Albright as a salesman. *Def.'s Ex.* 4.

Albright later became a principal of AOC; the facts surrounding the formation and ownership of AOC are disputed. A & S and Albright contend that Albright formed AOC in connection with A & S's sale to Albright in May 1998 of A & S's right to act as an Albin dealer. *Def.'s Ex.* 4; *A & S's Mot,* 5. In support of its contention, A & S relies on a complex document called the "Consignment Sales Agreement." According to the Consignment Sales Agreement, A & S expressed the intention "to make available to [AOC] new Albin motor vessels on a consignment basis ...." *Def.'s Ex.* 6. The terms upon which A & S agreed to make new Albin vessels available to AOC were as follows:

a. Only new Boats will be subject to this Agreement.

b. At no time will [A & S] be required to provide a total value of Boats, at cost, to the [AOC] in excess of $85,000.00.

c. All orders placed by [AOC] with [A & S] shall be subject to the approval of the [A & S].

d. Ownership and title to each Boat shall remain in [A & S] until [AOC] is paid all amounts due [A & S] ....

e. [AOC] shall have the right to enter into agreements to sell the Boats to retail customers and, at the closing of each such sale, [A & S] shall deliver title to the Boat in question in exchange for the payment ....

*Id.* ¶ 1. In return, the Consignment Sales Agreement required AOC to make the following payments to A & S with respect to each boat:

a. From the time a Boat is ordered until all payments have been made by [AOC] with respect to that Boat [AOC] will pay to [A & S] monthly an amount equal to 2% of the cumulative floor plan interest [A & S] has paid to date with respect to the boat in question.

b. At the time of the closing of the sale of each Boat [AOC] shall pay to [A & S] by certified or bank check the following:

(i) The full principal amount which [A & S] has paid for the Boat,

(ii) All floor plan interest which has been paid by, or is payable by, [A & S] with respect to the Boat; and

(iii) The balance, if any, which is due

. . . .

*Id.* ¶ 2. Although Albright executed the Consignment Sales Agreement as an "authorized representative" of AOC, the Consignment Sales Agreement does not establish as a matter of law that A & S transferred its right to act as an Albin dealer to Albright or to AOC. To the contrary, based on the plain language of the Consignment Sales Agreement and the circumstances described below, a reasonable juror could reasonably accept plaintiffs' characterization of the agreement—a wholesaler's contract, under which A & S acted as a wholesaler, purchasing vessels from Albin and in turn selling those vessels to AOC for further sale to retail customers such as plaintiffs.

Plaintiffs note, for example, that Arthur Malsin, Jr., was the resident agent of AOC upon its formation in April 1998. *See Pls.' Ex.* 3. Malsin remained as the resident agent until AOC's charter was forfeited in October 2000 for failure to file a property return in 1999. *Id.* A & S does not even attempt to respond to this showing.

Other agreements entered into by the principals of A & S and Albright contemporaneously with the execution of the Consignment Sales Agreement cast into serious doubt A & S's contention that A & S was wholly uninvolved in the transaction in dispute. A & S executed a promissory note in the amount of $19,500.00. The promissory note does not define the borrower, but lists the borrower's address as "Mr. Brent Albright, P.O. Box 151, Chester, Maryland 21619." *Def.'s Ex.* 6.

A & S also executed a Loan and Security Agreement for the principal amount of $19,500. *Id.* The Loan and Security Agreement defines borrower as AOC and the lender as A & S. According to this agreement, the borrower would repay the loan as follows:

As each new boat is sold by Borrower the greater of $5,000.00 or one-half of the gross profit, after the Borrower's paying (i) floor plan interest incurred by the Lender in the financing of the boat, (ii) the purchase price of the boat, (iii) commissions to brokers other than the Lender or the Borrower, (iv) actual out of pocket expenses related to commissioning and (v) any other amounts due under the terms of the Consignment Agreement, will be paid on the principal balance of the Loan. The Loan shall be absolutely payable in full by the borrower on the date set forth in the [Promissory Note] [, May 4, 2000.]

*Id.* Article 2, ¶ 3.

Finally, A & S executed an Option to Purchase LLC Membership Interest in AOC with Albright. Under this document, Albright possessed the right to purchase from A & S all of its interest in AOC. *Id.* The option provided that:

[It] may be exercised in whole only at any time beginning on the Commencement Date and prior to the Termination Date and shall be exercised by [Albright] delivering to [A & S] a written notice of exercise together with a fully executed promissory note which is in . . . the principal amount equal to the balance of the Option Price then due (the "Note").

*Id.* ¶ 2. The Option Price was defined as follows:

The price at which LLC interests shall be purchased upon the exercise of this Option shall be equal to $25,000.00 (the "Option Price"). After the holder has satisfied its obligations to the Optioner under the terms of the $19,500 Note it shall continue to make the payments set

forth in Article 2, Section 3 of the Loan and Security Agreement ... and all such payments, to the extent they would have constituted payments of principal under the terms of the Loan Agreement, shall be a credit toward the Option Price.

*Id.* Albright exercised the option to purchase A & S's interests in AOC in July 1999. *Pls.' Ex.* 4.

There is no dispute that AOC was never granted a Maryland dealer's license and was never designated as an authorized Albin dealer by Albin. According to A & S, because AOC did not have a Maryland dealer's license, A & S allowed AOC to use its "Chesapeake Motoryacht Sales" letterhead and to register and sell Albin vessels in that name. A & S asserts that, with the exception of its receipt of $93.92 in the form of a dealer's handling fee paid by state taxing authorities, A & S derived no income, remuneration, profit or other economic benefit from the sales of vessels (including the plaintiffs' vessel) by AOC.

A reasonable juror, properly instructed in the law of agency, and fully considering the factual circumstances sketched above, could reasonably conclude that A & S remained in the distribution chain of Albin products notwithstanding the paper trail relied on by movants. This conclusion is bolstered by consideration of the circumstances, viewed in the light most favorable to plaintiffs, surrounding the disputed transaction.

The original purchase agreement for plaintiffs' vessel was executed and their deposit was paid on or about October 24, 1998. On that date, Albright issued an invoice, which indicated a $5,000 deposit. The invoice was on AOC letterhead. *Def.'s Ex.* 10. Plaintiffs paid the initial $5,000 deposit by check issued to AOC. *Def.'s Ex.* 11. On or about November 3, 1998, Albin Marine issued an order confirmation to Albright and AOC. Albright signed the

order confirmation "under protest," apparently due to confusion regarding the price of the vessel. In response, Albin sent a memorandum to Albright indicating that the "factory pricing stands." *Def.'s Ex.* 13. Then, on or about November 27, 1998, Albright sent to Albin an AOC draft in the amount of $13,084 as payment of the balance of the deposit. *Def.'s Ex.* 14.

On or about February 23, 1999, plaintiffs apparently traded in their 1995 Albin to A & S and received $83,000. *Def.'s Ex.* 18. On or about February 27, 1999, plaintiffs and Albright signed the final AOC invoice designating the vessel price and listing the customer-specific additions. *Def.'s Ex.* 15.

On or about March 18, 1999, Albin issued an invoice indicating that the vessel was sold to A & S and shipped to Albright and AOC. *Def.'s Ex.* 16. On or about March 23, 1999, Albright prepared a "Settlement Summary" stating that the seller was "Chesapeake Motoryacht Sales/Albin on the Chesapeake." *Def.'s Ex.* 8. At some point, Albright executed two Bills of Sale on the letterhead of "Chesapeake Motoryacht Sales." Then, on March 25, 1999, A & S executed a Bill of Sale, with attached power of attorney, transferring 100% interest in the vessel to plaintiff Jurgensen. *Def.'s Ex.* 17. This Bill of Sale was filed with the United States Coast Guard Vessel Documentation Center on April 5, 1999. *Pls.' Ex.* 6.

On or about April 12, 1999, A & S transferred the Statement of Origin for the vessel to Jurgensen pursuant to a First Assignment. The document was executed on behalf of A & S by both "Brent Albright, Salesman" and "Susan C. Malsin, President." *Pls.' Ex.* 11. In May 1999, A & S handled matters relating to the titling of the vessel that the plaintiffs had traded-in. A & S received a $93.92 handling fee from the Maryland Department of Natural

Resources in connection with the official documentation of the vessel.

#### (iii)

This case involves both products liability allegations and breach of warranty allegations against the manufacturer and sellers of the vessel. None of the parties dispute the existence of admiralty jurisdiction over the tort claims asserted under the circumstances of this case. "All cases involving a tort committed on navigable water, whether brought under federal admiralty jurisdiction, in state court under the saving-to-suitors clause, or in federal court under diversity jurisdiction, are governed by admiralty law . . . ." *Wells v. Liddy*, 186 F.3d 505, 524 (4th Cir.1999) (quotations, citations and footnotes omitted), *cert. denied*, 528 U.S. 1118, 120 S.Ct. 939, 145 L.Ed.2d 817 (2000).

In *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–66, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the Supreme Court explicitly recognized strict products liability as a part of general maritime law. Much of maritime jurisprudence has borrowed the elements prescribed by Section 402A of the Restatement (Second) of Torts. *See, e.g., Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) (applying section 402A) ("The first principle is that tort law in this area [of commercial cases involving defective products] ordinarily (but with exceptions) permits recovery from a manufacturer and others in the initial chain of distribution for foreseeable physical harm to property caused by product defects."); *Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1134 (9th Cir. 1977) (applying section 402A); *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir.1972) (same); *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 338 (5th Cir.1984) (same).

Section 402A of Restatement (Second) of Torts provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). The above rules apply "to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor . . . ." *Id.* cmt. f.

#### (iv)

Here, the sole issue before me is whether A & S is a proper defendant, i.e., whether as a matter of law, A & S was outside the chain of distribution of the plaintiffs' vessel. A & S contends that it did not participate in any manner in the sale of the vessel to plaintiffs and therefore, is not subject to any liability arising out of the September 24, 1999 loss.

It seems clear, however, as mentioned above, that whether A & S was involved in the sale as the actual seller (as evidenced by the bills of sale), as the distributor (as evidenced by the Consignment Sales

Agreement), or as the dealer (in order to comply with legally required dealership regulations mandated by Maryland Department of Natural Resources regulations), are questions properly to be submitted to the jury. A & S was the authorized Albin dealer at the time of the sale, the transaction was conducted on its letterhead, the principal of A & S executed sworn statements that A & S was the dealer, and the official Abstract of Title for the vessel describes A & S in the chain of title as the seller to plaintiffs. That A & S earned only $93.92 on the transaction is of no moment.

Moreover, there is a dispute of material fact regarding Albright's relationship with A & S. A & S admits that Albright was a commissioned salesman for A & S from January 1998 to May 1998. A & S contends, however, that in May 1998, Albright's status changed and he became a principal of AOC. As discussed above, the import of Albright's relationship with AOC is not free from dispute. Documents contained in the record create at minimum a dispute of material fact as to Albright's precise status at the time of the sale. For example, the initial Bill of Sale executed by Albright and plaintiff Jurgensen was on Chesapeake Motoryacht Sales letterhead. *Pls.' Ex.* 7. Albright also prepared a "Settlement Summary" that stated that Albin sold the vessel using Chesapeake Motoryacht Sales as the dealer. *Pls.' Ex.* 8. A second bill of sale showing the value of the trade-in vessel was also on Chesapeake Motoryacht Sales letterhead and was jointly executed by plaintiff Jurgensen and Albright. *Pls.'s Ex.* 7. Again, Albright signed the bill of sale as "Brent Albright, Chesapeake Motoryacht Sales." *Id.* The application for title and registration also lists the dealer as "Chesapeake Motoryacht Sales." *Id.* In short, the record evidence, viewed as a whole and in favor of the plaintiffs (as it must be) precludes a conclusion as a matter of law that A & S was uninvolved in the disputed transaction.

(v)

For the above reasons, A & S's motion for summary judgment shall be denied.

## ORDER

In accordance with the foregoing Memorandum, it is this 27th day of August, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That the defendants' motion for summary judgment (Paper No. 42) and to strike (Paper No. 49) are DENIED; and it is further ORDERED

(2) That plaintiffs' motion to file surreply (Paper No. 51) is DENIED; and it is further ORDERED

(3) That the Clerk shall TRANSMIT copies of this Order and the foregoing Memorandum to the attorneys of record.